James H. Adamson v. Commissioner.
James H. Adamson v. Commissioner
Docket No. 3154.
United States Tax Court
1946 Tax Ct. Memo LEXIS 15; 5 T.C.M. (CCH) 1071; T.C.M. (RIA) 46286; December 11, 1946
Raymond C. Sandler, Esq., and Nathan Schwartz, Esq., 6253 Hollywood Blvd., Los Angeles, Calif., for the petitioner. Byron M. Coon, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent has determined a deficiency in income tax against petitioner in the amount of $429.16 for the year 1939; and petitioner claims he is entitled to a refund of $215.58. The only question presented is whether payments received by petitioner, under a certain contract, constituted ordinary income or a capital gain. Findings of Fact Petitioner, during the taxable year, was a resident of New York, and filed his original and amended income tax returns for 1939 with the collector of internal revenue for the third district of New *16 York. In 1925, petitioner was engaged in a prosperous contracting business, operating as the Superior Seating Company in New York City. Percy Adamson, a brother, was interested in developing yarns. He needed financial assistance and asked petitioner to help him. They entered into an oral partnership agreement, whereby petitioner was obligated to furnish the money and Percy was obligated to deal in yarns and develop ideas for constructing special or novelty yarns. They adopted the firm name of Adamson Bros. Company, and both were to cooperate in its management. Petitioner was to exercise a general supervision and control over the business, and Percy was to devote all of his time to it. The firm was given office space in petitioner's offices. It was understood that the partners would share equally in the profits and losses, and that each would have 50 per cent of the assets acquired. Petitioner, however, was to suffer the initial losses, should the business fail to get started successfully. The firm did very litle business prior to March 1926, at which time it made certain connections and began earning money. During the period from March 1926 to July 30, 1930, Percy made experiments *17 with special or novelty yarns, as he believed they had a commercial value and could be exploited as secret processes or by means of patents. He developed about 30 such yarns. The ideas conceived by Percy were treated by him and petitioner as the property of the firm. Several yarns were successively developed prior to 1930. In each instance Percy made arrangements with a mill or a manufacturer to make the product, and he sold the yarn for the account of the partnership. In 1930, Percy conceived the idea of an elastic yarn, and on July 24, 1930, he filed in the United States Patent Office an application for patent thereon. On June 11, 1931, after he had conducted further experimental and development work on the elastic yarn idea, he filed a new application for patent as a continuation-in-part of the former application. On September 8, 1931, United States Letters Patent No. 1,822,847 covering an elastic yarn issued upon that application. The firm of Adamson Bros. Company paid the expenses of prosecuting the patent applications and incurred liability for the development and experimental expenses. The invention was the property of the partnership and was so treated by petitioner and his *18 brother. The patented elastic yarn was and is known as "Lastex". On April 9, 1931, Adamson Bros. Company filed an application in the United States Patent Office for the registration of the trade-mark "Lastex", which was duly allowed by the patent office on May 8, 1931, under No. 313,213. It was the property of the partnership. On April 10, 1931, the next day after filing the application for the trade-mark, Percy entered into two contracts with the United States Rubber Company. One was a royalty agreement and the other a sales contract. In the first contract it was recited that Percy had invented certain new and useful improvements in knitted wearing apparel and elastic yarn, described in the patent application No. 470,400 filed July 24, 1930, and it was further recited that the Rubber Company desired "to acquire the exclusive right to make, use and/or sell elastic yarn and/or fabric in accordance with said invention and which may be covered by Letters Patent of the United States or foreign Letters Patent that may issue on said application and/or other applications that may be filed in this or in any foreign country." Percy covenanted that he was the owner of the invention. He granted *19 to the Rubber Company such exclusive right under said application "and under any patent granted thereon, and/or upon any continuation, division or renewal of said application." The Rubber Company agreed to pay Percy a royalty of 2 1/2 per cent of the net selling price of elastic yarn made and sold by it or its licensees under said agreement. Percy had also agreed to procure the assignment of the "Lastex" trade-mark to the company. In the other contract, it was agreed that Percy would represent the company as its sales agent in consideration of certain commissions. The two contracts were made simultaneously and were parts of a single transaction. On or about July 7, 1931, Adamson Bros. Company executed an assignment of the trade-mark "Lastex" to the United States Rubber Company. In the assignment it was recited that the Rubber Company desired to acquire the trade-mark "and the business and good will attached thereto" and the assignment transferred the trade-mark "together with the good will and the business in connection with which said trade-mark is used." Percy Adamson was spending a great deal of his time at the office of the Rubber Company, and much time was lost in going back *20 and forth between the two offices. In November 1931, Percy moved the offices of Adamson Bros. Company to the building occupied by the Rubber Company. He then assumed exclusive management of the partnership affairs, without the consent of petitioner. On January 2, 1932, Percy entered into two new agreements with the United States Rubber Company, which superseded the preceding contracts made on April 10, 1931. Percy made this substitution of contracts without informing petitioner. The superseding royalty agreement was quite similar to the previous document. The royalty remained at 2 1/2 per cent on sales. The agreement was to continue until the expiration of the last to expire of the Letters Patent to which it extended. The new sales agreement, accompanying the new royalty agreement, terminated the previous sales agreement. Under it, Percy was engaged to represent the Rubber Company as its special sales and promotional assistant, to sell for the company, and to promote the development and sale by the company and its licensees in the United States and Canada of elastic yarns or articles made of these yarns. He was to devote the major part of his time to such duties but could continue *21 to assist in the conduct of the business of Adamson Bros. Company to the extent of his then participation, Percy was to receive a fixed retainer of $1,000 per month, and an additional one per cent of the receipts of the company in cash upon all of its net sales in the United States and Canada during the year in excess of $1,000,000 and up to, but not exceeding, $15,000,000. This agreement was to continue from year to year but could be terminated by either party at December 31 of any year by giving one year's advance notice. Commissions and royalties under the United States Rubber Company contracts for 1931 to 1937 were (as determined in 1937 by the referee in litigation referred to below): Royalty
Sales
Year
Agreement
Commissions
Total
1931
$ 4,911.08
$ 10,819.36
$ 15,730.44
1932
26,733.57
13,252.85
39,986.42
1933
59,514.79
26,517.87
86,032.66
1934
74,078.06
38,166.13
112,244.19
1935
75,464.72
39,984.52
115,449.24
1936
96,450.96
50,304.03
146,754.99
1937 - 1st quar.
30,810.21
3,000.00 *
33,810.21 *
1937 - 2nd quar.
22,978.33
3,000.00 *
25,978.33 *
1937 - 3rd quar.
15,927.23
3,000.00 *
18,927.23 *
$406,868.95
$188,044.76
$594,913.71
*22 On November 1, 1931, when the office of Adamson Bros. Company was moved to the offices of the Rubber Company, the assets of the partnership consisted of the Lastex invention, the patent in which it is embodied, and the contracts with the Rubber Company. After November 1, 1931, the partnership realized no profits or other income except royalties and sales commissions received under the contracts with the Rubber Company. Neither the partnership nor petitioner, after November 1, 1931, engaged in the business of developing and dealing in yarns and textiles or in the development of ideas in the field of special yarns. Percy had failed to keep petitioner advised about the affairs of the partnership or to account to him for payments received from the Rubber Company. On May 14, 1934, petitioner commenced an action against Percy in the Supreme Court, New York County, New York, seeking dissolution of the partnership and an accounting of the affairs and property of the partnership. The Superior Seating Company, Inc. was also made a defendant *23 in the action. The case was referred to a referee who rendered his opinion on December 13, 1937, and made his report of findings of fact and conclusion of law on January 8, 1938. The latter was filed in the office of the Court Clerk on January 11, 1938, as the decision in the action, and judgment was entered July 8, 1938. The referee found that prior to the contracts with the United States Rubber Company the invention and patent and the "Lastex" trade-mark belonged to the partnership. He further found that the two contracts with the United States Rubber Company were properties of the partnership, and that petitioner and Percy were entitled each to an undivided one-half share as tenants in common in those contracts. He adjudged that Percy Adamson be directed to execute and deliver to petitioner an assignment of the undivided share in the contracts, which assignment was to be made by way of confirmation and further assurance of the title to petitioner. It was also provided in the judgment that Percy should pay to petitioner the sum of $271,044.92 on account of moneys collected by Percy pursuant to the contracts with the Rubber Company during the 1931-1937 period. Petitioner was allowed *24 interest on his share of the moneys collected by Percy after November 1, 1931. The obligation to pay this sum of money was discharged by agreements dated February 23, 1938, between Percy and petitioner, and September 11, 1939, between petitioner, his attorneys, Percy, and Superior Seating Co., Inc., and the payment of that money is not involved in this proceeding. The partnership between petitioner and his brother was "at will" and was to continue until one of the parties should repudiate it by notice to the other. The New York Court found that the partnership was terminated on March 24, 1934, by Percy. On or about the 20th of October 1939, petitioner, his attorneys, Percy, and the United States Rubber Company entered into an agreement wherein and whereby petitioner sold, assigned, and transferred to Percy all his right, title, and interest in and to the partnership which formerly existed between petitioner and Percy, under the firm name of Adamson Bros. Company, and all its assets, including the following: (a) the reversionary or other right in the trade-mark "Lastex" and its registration; (b) the invention for which United States Letters Patent No. 1,822,847 were issued under *25 date of September 8, 1931, together with all letters patent of foreign countries issued thereon and all applications therefor; (c) the two contracts both dated January 2, 1932, between Percy Adamson and the Rubber Company. Petitioner also therein assigned and transferred to Percy all his right, title and interest in and to the judgment entered in the office of the Clerk of the County of New York on or about July 8, 1938, in favor of petitioner and against Percy, and all moneys due thereunder. The judgment was included in the contract because it had determined that petitioner had a one-half interest in the Rubber Company contracts. The money portion of the judgment had been previously settled by agreement. The Rubber Company, under the four-party contract, and by virtue of a collateral agreement with Percy, agreed to make the following payments: (1) $110,000 without interest to petitioner's attorneys in certain installments; (2) $215,000 without interest to petitioner, $5,000 at the execution of the contract, and the balance in installments of $2,500 each, beginning on December 1, 1939, and thereafter on the first day of each second month until the total balance of $210,000 shall *26 have been paid. Petitioner advanced $27,500 during the period of the partnership, which paid all the expenses of developing the patent and trade-mark, including attorneys' fees, and also paid for the purchase of experimental apparatus. The cost and value of office equipment and apparatus was nominal. The Supreme Court of New York made no determination as to the cost or value of the partnership assets. Petitioner and his wife filed a joint income tax return, but she had no income or deductions of any kind, and the income deductions reported by petitioner for the year were his own. During the taxable year 1939, petitioner received payments in the amount of $7,500 under the contract of October 20, 1939. He also received $19,302.07 (on the money judgment under agreement with Percy) which he reported in his income tax return as royalties. He reported the $7,500 as capital gain. Respondent treated it as ordinary income and explained his adjustment as follows: The income received from the sale of your interest in the partnership of Adamson Brothers Company is taxable as ordinary income as it is deemed to constitute a sale of your interest as co-owner in the partnership properties *27 which represented the stock in trade of the partnership and which were held primarily for sale or other disposition to its customers in the ordinary course of business. Such assets were excluded under the definition governing what constitutes a Capital asset under Section 117(a)(1) of the Internal Revenue Code. Opinion ARUNDELL, Judge: Petitioner contends that by virtue of the four-party contract of October 20, 1939, he sold to his brother, Percy, either an undivided one-half interest in the invention and patent in which it was embodied and the Rubber Company contracts, or his interest in the partnership of Adamson Bros. Company. He further contends that regardless of which of the foregoing the transaction is deemed to be, in either case the $7,500 payment received in the taxable year constitutes the proceeds of sale of capital assets and is subject to tax at capital gain rates. Percy denied that there was a partnership between himself and petitioner, but that question was decided against him by the Supreme Court of New York in petitioner's suit for a dissolution and accounting. It was held that an oral partnership at will existed between the two from November *28 1925, and the matter was referred to a referee for an accounting. The referee found that the invention of elastic yarn, when made, the patent embodying it, when issued, and the trade-mark "Lastex", when acquired, were the properties of the partnership rather than the individual properties of Percy. Therefore, when Percy in April 1931 entered into contracts with the Rubber Company with reference to the patent and trade-mark and the practice of the invention to which they related, although he represented himself as the owner, he was in reality dealing with properties in which petitioner had an interest. Whether or not the Rubber Company contracts amounted to a sale of the patent to that company was not determined by the referee. The entire contracts are not in evidence in this proceeding, but excerpts therefrom are quoted in the referee's opinion and are likewise quoted in our findings. One of the contracts is referred to as a royalty or license agreement, but the quoted language suggests that it may have amounted to a sale or assignment rather than a license. Cf. Edward C. Myers, 6 T.C. 258. The other contract, the sales agreement, was but part of the same transaction, *29 as we have found. Both related to the exploitation of the patent by the Rubber Company. Regardless, however, of the exact legal effect of the contracts, Percy could not by his dealings with the Rubber Company deprive petitioner of his interest in the invention and patent without petitioner's consent, nor could he deprive petitioner of his right to a share in the fruits thereof. In any event, as was said by the referee, the Rubber Company contracts "were merely corollary to the invention and the patent" which, at least prior to the contracts, were the property of the firm rather than of Percy individually. The referee accordingly held that petitioner owned an undivided half interest in those contracts as tenant in common with Percy and ordered Percy to execute conveyances to petitioner by way of confirmation and further assurance of title in petitioner. Percy, from the time he moved the office of the partnership to the Rubber Company offices, wrongfully excluded petitioner from participation in the affairs and profits of the partnership. The referee in petitioner's accounting suit found that the partnership relation had been repudiated by Percy at least by March 24, 1934, if not *30 earlier. The judgment in petitioner's suit against Percy amounted to a final winding up of the partnership affairs. In view of the foregoing circumstances and other facts appearing in our findings, we think it cannot be said that petitioner, by the contract of October 20, 1939, sold his partnership interest as such, at least not in the sense that one sells an interest in a "going concern." In any event, however, we conclude that by the contract petitioner disposed of all his interest in the then remaining assets of the partnership, including the Rubber Company contracts and any interest he may then have had in the patent and trade-mark, which, although the partnership had been terminated, had not theretofore been divided and distributed. These assets constituted "property held by the taxpayer" (petitioner) for more than two years. Unless otherwise excluded from the category of capital assets by provisions of section 117(a)(1) * of the Internal Revenue Code, the gain from their disposition constitutes long-term capital gain. *31 We do not agree with the determination of respondent as stated in the deficiency notice that the properties sold represented the stock in trade of the partnership which were held primarily for sale or other disposition to its customers in the ordinary course of business. Certainly that would not be true of the Rubber Company contracts. Nor do we think it would be true of the patent and trade-mark, even if the partnership had been an active and going concern in the taxable year, which it was not. The partnership was not formed for the purpose of, nor did it engage in the business of selling patents. It was formed to deal in yarns, particularly those developed form Percy's ideas. For a number of years it did extensive merchandising to textile concerns of yarns manufactured for it. There is no evidence as to how many, if any, other patents than the "Lastex" patent were obtained by the partnership, and the proof does not show that any other patent was ever sold by it. Cf. Samuel E. Diescher, 36 B.T.A. 732, at p. 743. And see Edward C. Myers, supra, distinguishing in this connection Harold T. Avery, 47 B.T.A. 538. Nor can we agree with the respondent's *32 contention, on brief, that if petitioner had any interest in the patent which, by the contract of October 20, 1939, he sold, the patent would be excluded from the category of capital assets because it was depreciable property used in the trade or business. By the regulations (Reg. 103, sec. 19.117-1) the exclusion of depreciable property from the term "capital assets" is "limited to property used by the taxpayer in the trade or business at the time of the sale or exchange." Clearly the patent was not used in petitioner's business in 1939. The partnership, as such, had long since ceased doing business. Petitioner in the taxable year was engaged in an entirely different kind of business. From at least the time petitioner commenced his suit in 1934 for an accounting, he merely held his interest in partnership assets awaiting a final division and distribution. Finally, it is clear that no part of the undertaking of the Rubber Company to pay $215,000 to petitioner in installments represents, as respondent suggests, payment of royalty and commission income of the partnership which over the years Percy had wrongfully withheld from petitioner. The money portion of the judgment in the accounting *33 suit was settled by agreement between Percy and petitioner prior to the four-party contract of October 20, 1939. Nor do we think it may be said that any part of the $215,000 represents royalties and commissions that were to accrue in the future. The Rubber Company was bound at all events to pay petitioner the stipulated sum in consideration of the transfer of all petitioner's interest in the partnership assets, regardless of whether future sales of "Lastex" products were made by or for the Rubber Company, or whether its contracts with Percy continued to exist. Doubtless the Rubber Company was willing to agree to such payments in order to protect and remove any possible cloud from its rights under the patent and trade-mark. Petitioner, although he testified that he had contributed at least $27,500 to the partnership, makes no contention that at the time of the sale he had any unrecovered cost of the assets sold. He treats the entire payment of $7,500 in question as being gain and we likewise do so. For the reasons stated, we hold that the $7,500 payment constituted proceeds from the sale of capital assets and that it is subject to tax at long-term capital gain rates under section *34 117(a) and (b) of the Code. Decision will be entered under Rule 50. Footnotes
*. The sales commissions are settled yearly except for the $1,000 monthly payment. Consequently, final figures are not yet available for 1937.↩
*. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1); * * *↩