Albert J. Fihe v. Commissioner. Albert J. Fihe and Elizabeth M. Fihe v. Commissioner.
Fihe v. Commissioner
Docket Nos. 52394, 52396.
United States Tax Court
T.C. Memo 1956-139; 1956 Tax Ct. Memo LEXIS 157; 15 T.C.M. (CCH) 696; T.C.M. (RIA) 56139; June 12, 1956
Albert J. Fihe, Esq., 1671 Casale Road, Pacific Palisades, Calif., for the petitioners. Mark Townsend, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined the following deficiencies in income tax and additions to tax for negligence under Section 293(a): 5% Addi-
tion to Tax
Year
Deficiency
for Negligence
1946
$9,515.06
$475.75
1947
397.40
533.78
1948
6,926.70
346.34 The issues to be decided are: (1) Did petitioners understate business income for each of the years 1947 to 1949, inclusive, and did they claim excessive itemized deductions in each of said years? (2) Did petitioners understate income derived and received from Holly Molding Devices, *158 Inc., in 1947 and 1948 by the respective amounts of at least $10,056.57 and at least $861.90? (3) Did petitioners understate the taxable portion of long-term capital gain in 1948 derived from the sale of stock in Holly Molding Devices, Inc.? (4) Did the Commissioner properly determine that the 5 per cent addition to tax for negligence be imposed? A fifth issue, i.e. whether petitioner Elizabeth M. Fihe was a bona fide partner of Holly Molding Devices in 1946, has been conceded by the Commissioner and the concession can be given effect in a Rule 50 computation. General Findings of Fact Petitioners Albert J. Fihe and Elizabeth M. Fihe are husband and wife. They reside in Pacific Palisades, California. Albert filed a separate and an amended return for 1946 with the collector of internal revenue in Chicago, Illinois. Petitioners filed joint returns for the years 1947, 1948 and 1949, the return for 1947 being filed with the collector of internal revenue in Chicago, Illinois, and the returns for the latter two years being filed with the collector of internal revenue in Los Angeles, California. Albert (sometimes hereafter called petitioner) has been a practicing attorney specializing *159 in patent law for some 34 years. He maintained an office in Chicago for that length of time, closing it in 1948. He has had an office in Los Angeles, California, for 30 years. Petitioners moved from Chicago to California in 1948. In 1936 petitioners formed a partnership, known as Holly Molding Devices, with Harry Holly. Holly's wife also had an interest in the business. The partnership engaged in the manufacture and sale of hamburger molds. Holly was the inventor of the device and petitioner furnished his services in procuring the patent. Elizabeth was a bona fide member of the partnership in 1946, having a one-fourth interest therein. After petitioners moved to California in 1948, Albert engaged in the practice of patent law and the manufacture and sale of fishing equipment. Issue No. 1 Findings of Fact The Commissioner's determination of understatement of business income for 1946 was computed as follows: Expense
Claimed
Allowed
Disallowed
(1) Litigation Expense
$5,720.30
$4,720.30
$1,000.00
(2) Travel Expense
4,763.77
3,226.30
1,537.47
Total disallowed expenses
$2,537.47
(3) Unreported income - Los Angeles office
749.69
Total
$3,287.16
(4) Loss, Los Angeles office, claimed on amended
return, disallowed
(1,728,42)
Adjustment - increase in business income
$5,015.58
*160 The Commissioner's determination of understatement of business expenses for 1947 was computed as follows: Expense
Claimed
Allowed
Disallowed
(1) Legal
$4,269.26
$1,669.26
$ 2,600.00 *
(2) Travel
5,881.56
4,433.61
1,447.95
(3) Advertising
1,042.97
487.97
555.00
Total disallowed expenses
$ 4,602.95
(4) Gross receipts understated
943.22
Adjustment - increase in business income
$ 5,546.17
Business income (loss) per return
($ 3,151.10)
Increase per above adjustment
5,546.17
Business income as adjusted
$ 2,395.07
Less: Net operating loss from 1949 allowed
20,761.06
Business income (loss) as adjusted
($18,365.99)
Business loss claimed on return
(3,151.10)
Adjustment - decrease in net income
$15,214.89
For 1947 the Commissioner also disallowed certain of the itemized deductions claimed by petitioners as follows: Deductions
Claimed
Allowed
Disallowed
(1) Contributions
$ 448.15
$ 356.15
$ 92.00
(2) Taxes
7,680.88
1,397.50
6,283.38
(3) Medical
Disallowed because of percentage limitation
*161 The Commissioner's determination of understatement of business income for 1948 was computed as follows: Expense
Claimed
Allowed
Disallowed
(1) Interest
$3,111.84
$2,876.44
$ 235.40
(2) Taxes
2,600.84
2,089.55
511.29
(3) Losses
3,362.44
0
3,362.44
(4) Freight
1,630.41
505.96
1,124.45
(5) Legal
3,326.14
2,764.39
561.75
(6) Stationery
2,794.47
2,644.47
150.00
(7) Travel
8,679.14
2,876.17
5,802.97
(8) Commissions
1,426.30
626.30
800.00
(9) Advertising
3,483.94
2,885.80
598.14
(10) Repairs
535.33
460.76
74.57
(11) Postage
732.18
488.85
243.33
(12) Phone & Telegraph
1,323.41
1,251.88
71.53
(13) Depreciation
2,755.11
773.53
1,986.58
Total disallowed expenses
$15,522.45
(14) Add: Error in addition of deductions on return
584.20
(15) Unreported Receipts
280.45
Adjustment - increase in business income
$16,387.10
Business income (loss) per return
($33,363.88)
Increase per above adjustment
16,387.10
Business income (loss) as adjusted
($16,976.78)
For the year 1948 the Commissioner also disallowed certain itemized deductions claimed by petitioners as follows: Deductions
Claimed
Allowed
Disallowed
(1) Contributions
$ 664.48
$291.25
$ 373.23
(2) Casualty loss
2,300.04
0
2,300.04
(3) Medical
1,089.34
735.79
Percentage limitation
*162 The Commissioner's determination of understatement of business income for 1949 was computed as follows: Expense
Claimed
Allowed
Disallowed
(1) Repair
$2,517.15
$ 407.13
$ 2,110.02
(2) Advertising
3,658.25
976.59
2,681.66
(3) Litigation
1,042.22
794.82
247.40
(4) Travel
4,476.41
2,493.24
1,983.17
(5) Interest
3,909.95
3,308.89
601.06
(6) Postage
720.32
471.32
249.00
(7) Depreciation
2,550.40
1,843.23
707.17
(8) Telecast expense
1,661.62
(9) Bandmaster
632.50
Total disallowed expenses
$10,873.60
(10) Receipts understated
628.78
Total
$11,502.38
Less: Mathematical error
900.00
Net increase in business income
$10,602.38
For the year 1949 the Commissioner also disallowed certain of the itemized deductions claimed by petitioners as follows: Deductions
Claimed
Allowed
Disallowed
(1) Contributions
$ 285.51
$47.51
$ 238.00
(2) Interest
3,909.95
0
3,909.95
(3) Taxes
3,511.44
0
3,511.44
In their 1947 return petitioners included federal income and other federal taxes such as "Transportation," "Amusement" and "Pullmen" among their itemized deductions. In their *163 1948 return petitioners claimed as business deductions for freight and travel expenses, the cost of moving personal possessions from Chicago to California and the cost of maintaining the family in a hotel until a new home was established. In their 1948 return petitioners claimed a casualty loss of $2,300.04 for "Damaged and stolen furniture and stolen wallet." Of this amount $214 represented cash, which according to petitioner's records, was stolen from a wallet and the remainder represented the cost of purchasing new furniture to replace furniture which petitioner claimed was lost, stolen and damaged in the move to California. Petitioner deducted automobile expenses which included the cost of travel to and from work. He also deducted the cost of new suits as advertising expenses and testified in that connection, "If I do not look pretty prosperous, I do not get patent business," and "I think it is perfectly good advertising and the only way a lawyer can advertise." Opinion On this issue, the deductibility of claimed expense items and the resulting increase in taxable income by virtue of their total or partial disallowance, the determination of the Commissioner "has the support *164 of a presumption of correctness, and the petitioner has the burden of proving it to be wrong," Welch v. Helvering, 290 U.S. 111. Most of the items here involved were disallowed or partially disallowed because they were deemed to be "personal" expenses or were "unsubstantiated" or were "(duplications)." Petitioners have introduced no evidence which would serve to carry their burden of proving error in the Commissioner's determination. In this respect petitioner's testimony was of the most general nature. No testimony was offered with regard to the amount of specific expense items which would assist the Court in determining whether the allowance made on items partially allowed was correct. Aside from the general testimony of petitioner that such and such items were disallowed (in other words, a mere recital of what the Commissioner did) and the admissions of petitioner that mistakes were made in the returns, which, however, "cut both ways," the record contains no evidence which would help petitioners. What little specific testimony there was with respect to some of the claimed deductions only confirms the propriety of the Commissioner's ruling. We advert here to the deductions *165 claimed for federal income taxes paid, the expense of travel to and from work, the cost of maintaining the family in a hotel pending the establishment of a new home, the cost of new suits, and the $2,600 attorney fee which petitioner paid to assist Holly in defending himself against criminal charges because, as petitioner testified, "Harry had a family * * * and I really hated to see my partner go to the penitentiary." While this latter testimony evidences a charitable motive, it does not establish the basis for a business deduction. We hold that the attorney fees are not an ordinary and necessary business expense. Neither are the other items properly deductible. The record in this case is such that the so-called Cohan rule - Cohan v. Commissioner, 39 Fed. (2d) 540 can have no application. There has been no total disallowance of claimed deductions here in the face of a record clearly calling for some allowance. In most instances substantial amounts have been allowed and petitioners have not come forward with evidence which would justify the Court in increasing allowances above those amounts. On items totally disallowed petitioners have offered no substantiating evidence *166 whatever. Turning to the claimed casualty loss, the record contains little more than that the deduction was claimed on the return for 1948 and petitioner's testimony as follows: "In that connection, when we moved our furniture out here, (to California) it was certainly in a wreck somewhere, because when we got it, most of it was almost irreparably damaged - a beautiful marble top table that we had was just broken into smithereens - some of the fine furniture looked as if it had been dragged through the mud. The upholstery was torn and almost beyond repair. Some valuable lamps were gone completely. My wife had a very valuable ring somewhere in that furniture and it never did get here. May I say that at one time I saw my wife weeping very bitterly when she saw that furniture." This record falls far short of furnishing a basis for allowing the casualty loss. There was no evidence regarding the loss of cash in a wallet. No fair market value of the damaged furniture has been proved and no basis for the property has been shown. The claimed loss is disallowed for lack of proof. See Helvering v. Owens, 305 U.S. 468. Accordingly this issue must be decided for the Commissioner. *167 Issue No. 2 Findings of Fact On or about September 25, 1946, a corporation known as Holly Molding Devices, Inc. (hereafter called the corporation) was formed to carry on the business formerly carried on by the partnership. With the exception of certain improved real estate which was distributed to the former partners, all the assets and liabilities of the partnership were turned over to the corporation in exchange for capital stock which was issued to the former partners. The real estate was rented to the corporation for a time by the former partners. The corporation's name was later changed to Hollymatic Corporation. Petitioner was named president of the corporation and Elizabeth was named treasurer. During 1946 and 1947 petitioner was in charge of the corporation's books and records. In 1947 petitioner employed Barrow, Wade and Guthrie, a firm of certified public accountants to audit the books. Both petitioners had authority to draw checks on the corporation provided such checks were countersigned by either Harry Holly or his wife. Prior to sale by petitioners of their stock in the corporation (as will hereafter appear) corporate checks issued by Holly or his wife were *168 required to be countersigned by one of the petitioners. The corporate books and records reflect that outstanding liabilities in the respective amounts of $4,661.49 and $3,461.29 to petitioner and Elizabeth assumed by the corporation were credited to their personal accounts in 1946. The corporate books and records reflect that the following amounts were paid to petitioner by check in 1946: 11/ 1/46 Check for cash
$ 500.00
11/25/46 Check for cash
2,000.00
$2,500.00 These items were unexplained. The books and records of the corporation reflect salary paid or credited to petitioner during 1947 of $25,920. According to such books, $14,000 less withholding, was paid to him and $10,706.20 was credited to his personal account. The books and records of the corporation reflect the following credits to petitioner's personal account in 1947: $ 724.18
Loan to corp.
10,706.20
Accrued salary
140.00
Accrued rent
5,123.03
Patent Installment payments
(later reversed)
6,227.21
Patent Installment payments
100.00
Rent
918.12
Minimum on royalties
60.00
Accrued Rent
The books and records of the corporation reflect the following credits to *169 Elizabeth's personal account in 1947: $875
to correct advances
140
accrued rent
100
accrued rent
60
accrued rent
The corporation books and records reflect disbursements by check of $1,000 to petitioner and $800 to Elizabeth on January 10, 1947 and such disbursements were debited to their personal accounts. The personal records maintained by petitioner reflect receipt of this $1,800 amount on January 11, 1947. The corporation books and records reflect a disbursement by check on March 17, 1947 of $800 debited to the personal account of petitioner. The personal records maintained by petitioner reflect a cash receipt of $800 from the corporation on March 15, 1947. The corporation books and records reflect a disbursement by check of $3,000 to petitioner which was debited to his personal account on April 30, 1947. The personal records maintained by petitioner reflect a cash receipt of $3,000 from the corporation on April 22, 1947. The corporation books and records reflect a disbursement by check on April 3, 1947 of $1,000 which was allocated $700 to petitioner and $300 to Elizabeth and debited in such amounts to their personal accounts on April 30, 1947. The *170 personal records maintained by petitioner reflect a cash receipt of $1,000 from the corporation on April 1, 1947. The corporation books and records reflect two additional disbursements by check of $700 and $2,325 in April which were debited to the personal account of petitioner on April 30, 1947. The personal records maintained by petitioner reflect cash receipts from the corporation of $700 on April 17, 1947 and $2,325 on April 26, 1947. The corporation books and records reflect that salary in the amount of $14,000 was disbursed by checks to petitioner in 1947. The personal records maintained by petitioner reflect cash receipts of salary in the total amount of $11,523.10. These are net amounts and do not reflect withholding for income and social security taxes. The corporation books and records reflect a disbursement by check to petitioner on June 20, 1947 of $3,632.05 which was debited to his personal account on June 30, 1947. The personal records maintained by petitioner reflect a cash receipt of $3,632.05 from the corporation on June 25, 1947. The corporation books and records reflect a disbursement by check to petitioner on May 13, 1947 of $2,600 which was debited to his *171 personal account on May 31, 1947. This check was issued to pay legal fees for Harry Holly pursuant to an agreement with petitioner and the personal records maintained by petitioner do not reflect this amount as a receipt of income. The corporation books and records reflect a debit of $5,890 to petitioner's personal account on September 30, 1947. The personal records maintained by petitioner reflect a cash receipt of $5,890 from the corporation on September 12, 1947. The corporate books and records and/or the personal records maintained by petitioner reflect that the following amounts were disbursed by checks from the corporation to the petitioners in 1947: 1/10/47
$ 1,000.00
1/10/47
800.00
3/17/47
800.00
3/21/47
550.00
4/30/47
3,000.00
4/30/47
1,000.00
(Reflected as $700 debit to petitioner and $300 debit to
4/30/47
Elizabeth; Reflected as one receipt on petitioner's per-
sonal records)
4/30/47
700.00
4/30/47
2,325.00
5/31/47
2,600.00
6/30/47
2.94
6/30/47
3,632.05
6/30/47
408.54
9/30/47
5,890.00
12/ 5/47
2,292.36
Add
11,523.10
(Representing amounts disbursed by check, roughly net
of withholding tax, as per corporate records, and peti-
tioner's personal records)
Total
$36,523.99
*172 (NOTE: Above total does not include the $1,000 option payment of December 13, 1947, hereafter referred to.) The books and records of the corporation reflect the following credits to petitioner's personal account in 1948: $ 42.50
To reverse entry applicable to Old Age Benefit - deducted
from employee later
890.67
To record purchase of furniture and fixtures from A. J.
Fihe under agreement dated 1/19/48
981.90
To close balances of Fihe's accounts, charged to A. J.
Fihe's salary
5,000.00
To record purchase of patent rights, capital stock and
land and buildings from A. J. and E. M. Fihe under
option agreement dated 12/13/47
The corporate books and records reflect that petitioner received salary, net of withholding tax, in 1948 in the form of corporate checks as follows: 1/ 2/48
$327.10
($72.90 withheld as taxes)
1/ 9/47
327.10
($72.90 withheld as taxes)
1/16/48
327.10
($72.90 withheld as taxes)
1/31/48
861.90
The books and records of the corporation reflect the following debits to petitioner's personal account in 1947 which are not reflected on the personal records maintained by petitioner: 4/30/47
General Journal entry. To transfer advances to officers to
proper accounts
$ 350.00
4/30/47
G.J. entry. Charge back unauthorized salaries paid to execu-
tives in December
$1,499.50
4/30/47
G.J. entry. To charge Mr. Fihe for items in equipment ac-
count covering Mr. Fihe's filing cabinets for patents and
so forth
$ 563.47
4/30/47
G.J. entry. To charge personal accounts for excess pay-
ments on taxes withheld
$ 86.34
4/30/47
G.J. entry. To charge owners of building for mortgage and
interest on same paid by the corporation
$ 256.25
4/30/47
G.J. entry. Interest on officers' life insurance loans, paid
by the company, charged back to the appropriate officers
$ 61.58
4/30/47
G.J. entry. To charge portion of traveling expenses to re-
spective officers
$ 705.96
4/30/47
No explanation
$1,199.28
4/30/47
To adjust salaries upon which tax has been paid and not
deducted
$ 3.50
4/30/47
Cash disbursement
$ 2.94
9/17/47
G.J. entry. To charge interest on insurance loans to off-
cers concerned
$ 34.04
9/30/47
G.J. entry. To correct distribution of check No. 8737 charged
to Workmen's Compensation Insurance in error. Insurance
agent states that this does not cover a company policy
$ 250.00
12/ 5/47
Check issued to Mr. Fihe. Explanation of "royalties" crossed
out and no explanation given
$2,292.36
Total
$7,305.22
*173 The books and records of the corporation reflect the following debits to Elizabeth's personal account in 1947 which are not reflected on the personal records maintained by petitioner: 3/21/47
Check payable to Mrs. Fihe
$ 550.00
4/30/47
G.J. entry. To adjust salaries upon which tax has been
paid and not deducted
$ 1.75
4/30/47
G.J. entry. To charge back unauthorized salaries paid to
executives in December
$ 449.75
6/30/47
Check payable to Mrs. Fihe
$ 408.54
Total
$1,410.04
With the exception of one entry reflecting the payment of petitioner's income tax by the partnership, petitioners' books and records reflect only receipts which were deposited in petitioners' bank accounts. Ultimate Findings The petitioners received or had unfettered command of at least $10,056.57 and $861.90 from Holly Molding Devices, Inc. in the years 1947 and 1948, respectively, which they did not report as taxable income in those years. Opinion Here again we are faced with the question of whether or not petitioners have carried their burden of disproving the presumptive correctness of the Commissioner's determinations. On this phase of the case the Commissioner *174 determined, with respect to the year 1947, that petitioners had received additional income consisting of $8,890 as dividends and $1,166.57 as royalties from Holly Molding Devices, Inc. and, with respect to the year 1948, that petitioner had received $861.90 as additional salary. As appears from the record, these determinations were based primarily on the books of the corporation and were supported by the testimony of a witness who, at the time of the hearing and for some time prior thereto, had control of such books and records. This witness testified with respect to what the books and records showed with respect to receipts of the petitioners from the corporation in actual cash payments and also credits during the taxable years. For a time prior to sale of their stockholdings in the corporation by petitioners this witness had been charged with the responsibility of entering figures on the payroll account at a time when he was also the corporation's purchasing agent. At the time of the hearing he was comptroller of the corporation, in charge of the corporate books and records. The findings which we have made with respect to this issue are based on the testimony of this witness as *175 to entries contained in the books and records, and while we recognize that books and records are merely evidentiary of the real nature of the transactions they reflect, yet when we balance the comptroller's testimony against the seemingly contrary evidence, consisting as it does of petitioner's oral denial that he ever "received" the amounts testified to, together with the corroboration of the corporate records by petitioner's own records (which, however, only reflected amounts deposited in his bank accounts), we can only conclude that the evidence fails to overcome the presumption of correctness that attaches to the Commissioner's determination. See A. W. Henn, 20 B.T.A. 1133, pages 1150, 1151, where we said, "It is not enough to justify the exclusion of these items from his gross income derived in the course of complicated financial transactions such as are disclosed by the evidence, for petitioner to say merely that he did not receive the money in his actual possession." To point up how true this statement is as far as 1947 goes, we point to the $2,600 item for attorney fees paid by petitioner on behalf of his partner, Holly, in Holly's criminal case. According *176 to the corporate records this item was at the command of petitioner and was expended by him. Yet it does not appear in his personal records as a receipt and was not reported by him as income, though he does (improperly we have held) claim it as a deduction. The failure to include this item is typical of petitioner's explanations on this score. He excused it by saying "I certainly haven't got the money. In fact I spent the money. It is gone." This, of course, is no excuse for failing to include amounts as income which came into petitioner's control at a time when the corporation ostensibly could pay them and when the petitioner was in control of the corporate books and for aught that appears of record could have taken down payment directly. A facet of petitioner's defense on this issue is his attack on the accuracy of the comptroller's testimony. Petitioner testified that after he and his wife disposed of their stock in the corporation, accountants were called in by the new management to audit the corporate books and that these accountants caused certain entries to be made which are the root of his troubles, inasmuch as so-called corrective entries made by the accountants did not *177 truly reflect the facts. We are of the opinion that this testimony in no way destroys the probative value of the corporate books. The accountants who caused the corrections to be made were the same accountants employed by petitioner himself to audit the records at a time when he himself was in control of the corporation. Their competency is in no way impugned by petitioner's testimony and we have no reason for discounting the accuracy of entries as shown on the books. Turning to the year 1947 we find that the Commissioner has added $861.90 as salary to petitioner's income as additional income. For that year petitioner reported he had received salary of $1,200 from the corporation, yet he attached to his return Form W-2 showing receipt of total wages of $2,061.90 and withholding tax of $206.70. It is the difference between the $2,061.90 shown by Form W-2 and the reported $1,200 which the Commissioner has added to petitioner's taxable 1948 income. We find no adequate explanation whatever in the record for petitioner's faulty reporting and have found that the difference of $861.90 should have been reported as taxable income in accordance with the Commissioner's determination. While *178 the notice of deficiency states that petitioners understated "dividends and royalties" received from the corporation in 1947 in the respective amounts of $8,890 and $1,166.57 and while it is not clear that these respective amounts were actually "royalties and dividends" rather than other forms of taxable income, we think the entire record supports the Commissioner's determination that there was an understatement of at least $10,056.57 in taxable income for 1947, as well as an understatement of salary in the amount of $861.90 in 1948. Accordingly, the Commissioner's determinations on this issue are sustained. Issue No. 3 Findings of Fact In December 1947 petitioners gave an option to the corporation whereby they agreed to sell to the corporation their capital stock, their interest in patents used by the corporation and their interest in certain improved realty which had been distributed to the partners upon dissolution of the partnership. Petitioners received a payment of $1,000 on the option on December 13, 1947. In January of 1948 the corporation exercised the option and paid to petitioners $24,000 by check. In addition, the corporation gave to petitioners two notes in the *179 total principal amount of $70,000 secured by a chattel mortgage on the corporate machinery and equipment. Further, a credit was entered to petitioner's personal account on the corporate books in the amount of $5,000 which settled a debit balance in that amount in his personal account. The improved realty involved in this transaction was the real estate distributed to the individual partners upon dissolution of the partnership. It was conveyed to the corporation in 1948. Commencing February 29, 1948 payments were made to petitioners on the notes and mortgage in the amount of $1,750 per month plus interest. These payments continued until the entire amount was paid. Petitioners received payments on principal totalling $17,500 in 1948. The cost of the improved realty distributed to the four partners in September 1946 was $11,991.32. Petitioner received his interest in the patents transferred to the corporation in exchange for his legal services in obtaining the patents. The assets and liabilities of the partnership, with the exception of the improved realty, were transferred to the corporation in exchange for capital stock. The capital accounts of the individual partners as of *180 the date of the transfer of the partnership assets and liabilities to the corporation were as follows: H. H. Holly
$ 8,174.57
Agnes Holly
8,174.57
Albert J. Fihe
8,174.57
Elizabeth M. Fihe
8,174.57
Total
$32,698.28
At the time of the transfer, 200 shares of capital stock were issued by the corporation in the total amount of $20,000 and paid-in surplus was credited in the amount of $12,698.28. Liabilities of the partnership to petitioners in the total amount of $8,122.78 were assumed by the corporation. Petitioners reported $41,500 as the amount realized on the sale of their interests to the corporation and a basis for such interests of $27,624.36. Petitioners computed on a separate schedule D the amount reported as net capital gain in their 1948 return but did not file the schedule of the return. Petitioners, in computing the net capital gain reported on their 1948 return, deducted losses incurred in the sale of a personal residence and the sale of personal furniture and fixtures. In his determination the Commissioner disallowed the losses from the sales of the personal residence and of the furniture and fixtures. The Commissioner also determined *181 that petitioner realized $100,000 in 1948 from the sale of their interests to the corporation, as follows: Option payment (made in De-
cember 1947)
$ 1,000
Cash payment (made in Janu-
ary 1948)
24,000
Credit to personal account of
A. J. Fihe
5,000
Face amount of notes and mort-
gage
70,000
$100,000
In computing gain on the sale the Commissioner deducted a basis of $20,595.37, computed as follows: Basis of Patents
0
Basis of Stock
$16,349.14
Basis of real estate
Cost
$11,991.32
Less: Depreciation
(as adjusted by
respondent)
3,498.86
$8,492.46
Petitioners' share thereof
(50% of $8,492.46)
4,246.23
$20,595.37
Opinion Petitioners allege error in the Commissioner's determination on this issue as follows: "The Commissioner was in error when disallowing losses on sales of residences and furniture due to removal of business and residence from Illinois to California. The Commissioner erred in computing the long term capital gain and the sale of stock of Holly Molding Devices, Inc. He erred in arbitrarily assuming that the cost of the stock was approximately $20,000.00, when in fact it was over $35,000.00. The *182 examiner further arbitrarily assessed the entire receipt for the sale of our interest in Holly Molding Devices Inc., onto the year 1948. We received approximately $100,000.00 for the sale of our interests in said corporation, but only $25,000.00 of this was paid in cash, the remainder being secured by a mortgage note on the corporation properties and payable in monthly instalments of $1,750.00. We reported these sums as received in 1948 and succeeding years, and should not be taxed with the entire amount in a single year when the total was not collected until several years later. Furthermore, the mortgage notes deliberately omitted the word 'or order' after our names as payees, thereby making these notes nontransferable. The fact that said notes were nontransferable and non-negotiable eliminates any possibility of a tax payment on the full amount of the sale until such time as the actual amounts of the notes had been collected by us. These nonnegotiable promissory notes must be considered as having no fair market value." The alleged error in disallowing losses on the sale of the residences and furniture, which are shown by the record to have been of a personal nature needs no comment. *183 It is almost axiomatic that such losses are not allowable. That the sales were made because petitioner moved his residence from Chicago to California because he moved his offices there in no way changes the personal character of the transaction. These claimed losses are not proper. Turning next to the basis for the shares of stock and other property turned over to the corporation in 1948, we note that the Commissioner allowed a basis of $20,595.37, computed as shown in our findings of fact. Petitioners claimed a basis of $27,624.36. To prove error in the Commissioner's determination, petitioners rely on their self-serving oral testimony to the effect that they advanced from $36,000 to $50,000 to the partnership and that these advances should be taken into consideration in computing basis. To corroborate this testimony a series of notes of the partnership to petitioner aggregating some $12,724.36 dated in 1940 and 1942 were introduced in evidence. One of the notes bore endorsements showing credits of $6,211.29. This evidence is inadequate to overcome the correctness of the Commissioner's determination of basis which is supported by other evidence of record. Even if we accept at face *184 value petitioners' oral testimony that they made the claimed advances to the partnership it still seems certain that substantial sums were repaid to them which would reduce the cost of their stock. Their testimony as to these transactions is fragmentary at best. They have not come forward with evidence which would establish error in the Commissioner's determination of basis, which is sustained. Another facet of this issue is petitioners' contention that the Commissioner improperly taxed the full amount of the gain on the sale of the stock and other property to the corporation in 1948 (the year of sale) instead of prorating the gain over the years 1948 and 1949. Petitioners' contention appears to be two-pronged - first, that they are entitled to report on the installment basis and second, that the notes they received in part payment were "non-negotiable" and "must be considered as having no fair market value." Petitioners are not entitled to report their gain on the installment method. In order to be so entitled the initial payment must not exceed 30 per cent of the total sales price. Here the total price was $100,000 and in 1948 the record shows that petitioners received at least *185 $24,000 in cash and monthly payments totalling $17,500 in 1948, a total of $41,500. Thus, more than 30 per cent of the purchase price was received in 1948. Accordingly it was not proper for them to use the installment method of reporting. Sec. 44(b), Internal Revenue Code of 1939. With respect to the claim that the corporate notes received in partial payment were "non-negotiable" and must be taken to have no fair market value, we observe that the notes themselves were not produced in evidence and that there is no evidence in the record establishing that the notes had no fair market value. Having challenged the correctness of the Commissioner's determination that the notes had value, petitioners assumed the burden "of proving not only that respondent's (Commissioner's) determination of value was incorrect, but also what the correct value was, in fact." W. H. Batcheller, 19 B.T.A. 1050, 1055. This burden has not been carried. Petitioners rely on Dudley T. Humphrey, 32 B.T.A. 280 and a memorandum opinion of this Court where non-negotiable notes were held to have no fair market value. The cases of Mainard E. Crosby, 14 B.T.A. 980 and Edward J. Hudson, 11 T.C. 1042 *186 might also have been cited. All, however, are distinguishable. In Humphrey the opinion specifically states, "The testimony is that the notes had no fair market value." And in Crosby and Hudson the notes were subject "to many complicated agreements and conditions." As stated above, here there is no evidence that the notes had no fair market value, the notes are not in evidence, and so far as the record goes they were not subject to conditions affecting their payment. (As a matter of fact they were paid strictly according to their tenor in a compartively short time.) Further, the notes were secured by a chattel mortgage which was not shown to have had no fair market value. With the record in this state we are not constrained to disturb the Commissioner's determination that the notes had a value equal to their face and are to be taken as the equivalent of cash. Issue No. 4 Findings of Fact We incorporate by reference the facts heretofore found and in addition find that in 1940 petitioner was admonished by an internal revenue agent to keep more accurate books and records, and that the books and records maintained by petitioner in the taxable years were incomplete and did not properly *187 and accurately reflect the taxable income of petitioners. Part of the deficiencies for each of the years 1946, 1947 and 1948 is due to negligence on the part of petitioner. Opinion We think the facts amply support the Commissioner's addition to tax for negligence. The fact that petitioner was an attorney, coupled with the inadequacy of his books, the character of the deductions and losses claimed (some of which were clearly improper and others, duplications) are sufficient evidence to justify the addition to tax for negligence. Decisions will be entered under Rule 50. Footnotes
*. This item represents the payment by petitioner of legal fees for Harry Holly in connection with the defense of a criminal action against Holly.↩